**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CIVIL ACTION COMPLAINT**
**NUMBER**

**JURY TRIAL DEMANDED**

**DERRICK JACOBS,**
***PLAINTIFF***

**V.**

**CITY OF PHILADELPHIA, PHILADELPHIA DISTRICT ATTORNEY LAWRENCE "LARRY" KRASNER. PHILADELPHIA POLICE COMMISSIONER KEVIN BETHEL, PHILADELPHIA POLICE COMMISSIONER DANIELLE OUTLAW (FORMER), PHILADELPHIA DEPUTY POLICE COMMISSIONER DENNIS WILSON (RETIRED) PHILADELPHIA DEPUTY POLICE COMMISSIONER FRANK VANORE, PHILADELPHIA POLICE LIEUTENANT JAMES FERGUSON, PHILADELPHIA POLICE INSPECTOR DF PACE, PHILADELPHIA POLICE LIEUTENANT JASON HENDERSHOT, CITY SOLICITOR MARCEL PRATT (FORMER), DEPUTY CITY SOLICITOR NICOLE MORRIS DEPUTY CITY SOLICITOR KIA GHEE (FORMER), et al.**
***DEFENDANTS***

## FEDERAL CIVIL RIGHTS COMPLAINT

**AND NOW**, Plaintiff, Derrick Jacobs, proceeding pro se, hereby files the following Civil Action Complaint for damages against City of Philadelphia, Philadelphia District Attorney Lawrence "Larry" Krasner, Philadelphia Police Commissioner Kevin Bethel, Philadelphia Police Commissioner Danielle Outlaw (Former), Philadelphia Deputy Police Commissioner Dennis Wilson (Retired), Philadelphia Deputy Police Commissioner Frank Vanore, Philadelphia Police Lieutenant James Ferguson, Philadelphia Police Inspector DF Pace, Philadelphia Police Lieutenant Jason Hendershot, City Solicitor Marcel Pratt (Former), Deputy City Solicitor Nicole Morris, -Deputy City Solicitor Kia Ghee, et al. (collectively, "Defendants") and in support thereof avers as follows:

## SUMMARY

In 2018 Detective Derrick Jacobs ("Jacobs") observed numerous acts of corruption and criminal activity at the Philadelphia District Attorney's Office under District Attorney Lawrence "Larry" Krasner's enacted policies, customs and practices.

Jacobs immediately reported these acts of corruption and criminality to his superiors.

Jacobs immediately began to receive retaliation as a result of being a "Whistleblower" under Pennsylvania Whistleblower Law ("PWL"). Those acts included threats of arrest, constructive discharge, illegal wiretapping, and the latest discrete adverse employment action; denial of reinstatement to the Philadelphia Police Department ("PPD").

Jacobs' whistleblower activities preceded **Common Pleas Court Judge Barbara McDermott, Judge Karen Simmons, Judge Defino-Nastasi, The Pennsylvania Supreme Court, Justice Kevin Dougherty, Federal District Court Judge Mitchell Goldberg, Federal District Court Judge Joel Slomsky, Common Pleas Court Judge Anne Marie Coyle, The Pennsylvania Attorney General's Office, Federal District Court Judge Paul Diamond, and The Third Circuit Court of Appeals.**[1]

What every Judge, Justice, and Court determined AFTER Jacobs' "Whistleblower" activities is that the Philadelphia District Attorney's Office under Krasner lacked candor, made intentional misstatements to the court(s), manipulated and/or destroyed evidence, and misled grand juries.

After Jacobs went public with his allegations and informed the public that Krasner's DAO was a **"Clear and Present Danger" running a "criminal enterprise,"** the Defendants assaulted Jacobs' Constitutional freedoms and terminated his employment.

The one Judge who is not listed above and in Jacobs' opinion acted in furtherance of Krasner's criminal activity is Federal District Court Judge Harvey Bartle III.

## INTRODUCTION

In 2018, Plaintiff Detective Derrick Jacobs ("Jacobs") observed egregious acts of corruption by the Philadelphia District Attorney's Office.

Those acts included, but were not limited to, tampering and destroying evidence, illegally releasing convicted murderers, soliciting perjury from witnesses, and illegally arresting police officers.

These acts of corruption have cost the tax-paying citizens of Philadelphia tens of millions of dollars. Some estimates are higher than a hundred million dollars.

In 2018 Jacobs informed his then Commanding Officer, Jason Hendershot, of these acts of corruption and criminality.

[1] The listed judicial bodies have authored judicial findings that the Philadelphia District Attorney's Office under Lawrence Krasner has misled the Courts, lacked candor, destroyed/tampered with evidence, targeted and treated law enforcement officers differently among other actions of corruption and prosecutorial misconduct.

The Defendants immediately conspired to retaliate against Jacobs for his "Whistleblower" activity with adverse employment actions.

The latest adverse employment action occurred in 2026 when Defendants denied Plaintiff reinstatement, without justification and in retaliation for his exposure of corruption by high-ranking City of Philadelphia officials, including but not limited to, listed defendants.

Plaintiff seeks declaratory, injunctive, and monetary relief for Defendants' unlawful retaliation, including constructive discharge, denial of reinstatement, and other adverse employment actions, taken in response to Plaintiff's protected speech and reporting of wrongdoing.

## JURISDICTION AND VENUE

This action is brought under 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. 1988.

This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## PARTIES

1. Plaintiff: Derrick Jacobs ("Plaintiff" "Jacobs")
2. Defendant: City of Philadelphia ("City")
3. Defendant: Philadelphia Police Commissioner Kevin Bethel ("Commissioner" "Bethel")
4. Defendant: Philadelphia District Attorney Lawrence "Larry" Krasner ("Krasner")
5. Defendant: Philadelphia Police Commissioner Danielle Outlaw (Former) ("Outlaw")
6. Defendant: Philadelphia Deputy Police Commissioner Dennis Wilson (Retired) ("Wilson")
7. Defendant: Philadelphia Deputy Police Commissioner Frank Vanore ("Vanore")
8. Defendant: Philadelphia Police Lieutenant James Ferguson ("Ferguson")
9. Defendant: Philadelphia Police Inspector DF Pace ("Pace")
10. Defendant: Philadelphia Police Lieutenant Jason Hendershot ("Hendershot")
11. Defendant: Philadelphia City Solicitor Marcel Pratt (Former) ("Pratt")

12. Defendant: Philadelphia Deputy City Solicitor Nicole Morris
13. Defendant: Philadelphia Deputy City Solicitor Kia Ghee (Former) ("Ghee")
14. The above Defendants will be collectively referred to as "Defendants"
15. **Defendants are being sued in their official and individual capacities.**
16. At all times relevant Defendants actions were committed in this jurisdiction.

## NATURE OF THIS ACTION

17. In 2018 (July) Plaintiff Derrick Jacobs ("Plaintiff," "Jacobs") began reporting ("Whistleblowing") acts of corruption and criminality at the Philadelphia District Attorney's Office under Philadelphia District Attorney Lawrence Krasner to his [Jacobs] superiors.
18. On September 27, 2018, Defendant Tracy Tripp observed Jacobs speaking with Fraternal Order of Police ("FOP") attorney Fortunato "Fred" Perri inside the Criminal Justice Center ("CJC").
19. Tripp contacted Jacobs' Commanding Officer Lieutenant Jason Hendershot immediately to obtain the nature of Jacobs' privileged communications with his FOP counsel.
20. Hendershot contacted Jacobs and asked for the nature of his communications with Perri.
21. Jacobs informed Hendershot (Jacobs' superior and Commanding Officer) his communications with Perri were related to the corruption and criminality at the Philadelphia District Attorney's Office.
22. On or about October 16, 2018, Jacobs learned the Philadelphia District Attorney's Office convened meetings with Krasner, Tripp, Patricia Cummings, Nancy Winkleman, and others to stop Jacobs from exposing their corruption.
23. Defendants concocted a plan to silence Jacobs with a malicious prosecution if he attempted to publicly expose their corruption and criminality.
24. On November 9, 2018, Defendants threatened Jacobs with fabricated "Contempt of Court" charges if he did not remain silent regarding the corruption and criminality at the Philadelphia District Attorney's Office under Lawrence Krasner.

25. Jacobs' Commanding Officer, Jason Hendershot stated he told his superiors, including Frank Vanore (Chief Inspector at the time) and Deputy Police Commissioner Dennis Wilson, about the crimes being committed against Jacobs.
26. Jacobs was informed by his attorney that if he remained silent regarding the Philadelphia District Attorney's Office corruption, the charges would be withdrawn.
27. In May 2019, Hendershot informed Jacobs and Sierra [William] the charges would be withdrawn in July 2019 by Tripp.
28. On August 1, 2019, Tripp informed Jacobs she withdrew the Contempt of Court charges against him.
29. On October 4, 2019 Jacobs filed two Federal Civil Rights Complaints against the City of Philadelphia, The Philadelphia District Attorney's Office, and the Philadelphia Police Department and others (19-cv-4615 and 19-cv-4616).
30. On October 4, 2019 Jacobs contacted then Philadelphia Police Commissioner Christine Coulter ("Coulter") and asked her for "Whistleblower" protections.
31. Coulter would later testify Defendant Marcel Pratt ("Pratt") informed her, through Brian Abernathy, Jacobs was not entitled to "Whistleblower" protections for reporting corruption at the Philadelphia District Attorney's Office ("DAO").
32. Coulter testified she immediately told her subordinate Deputy Police Commissioner Dennis Wilson to relay that information to Jacobs.
33. Wilson disobeyed Coulter's orders and did not inform Jacobs but lied to her and told her he had informed Jacobs.
34. On October 17, 2019 Wilson was served as a defendant in Jacobs' complaint.
35. Wilson immediately retaliated and ordered Jacobs' Commanding Officer, Hendershot, to spy on Jacobs and report back to Deputy City Solicitor Kia Ghee.
36. On November 18, 2019, Ralph Cipriano of bigtrial.net authored an article outlining Jacobs' federal complaint and the DAO corruption allegations outlined in the complaint.
37. On Monday, November 18, 2019, Hendershot contacted Jacobs and told him he was taking Jacobs' police vehicle.
38. This was two days after Jacobs attended his brother's funeral.

39. Jacobs told Hendershot he was confiscating his vehicle in retaliation for him [Jacobs] filing federal complaints. Jacobs told Hendershot he would no longer have the ability to respond to assignments.
40. Hendershot refrained and did not take Jacobs' police vehicle. However, Hendershot did contact mobile communications and had Jacobs' cellular notifications terminated. Jacobs would not receive notifications of Officer Involved Shootings ("OIS").
41. On November 26, 2019, Jacobs informed Hendershot he was going to the Inspector General's Office ("IG") to report on the corruption at the DAO.
42. On November 26, 2019, right before Jacobs entered the IG, Hendershot informed Jacobs Deputy Police Commissioner Dennis Wilson ("Wilson") summoned Jacobs to his office.
43. Wilson informed Jacobs he had read the bigtrial.net article written by Ralph Cipriano.
44. Wilson also commended Jacobs for exposing corruption.
45. Jacobs informed Wilson he was contacted by other media outlets, including Chris Palmer of the Inquirer. Jacobs informed Wilson he would contact other media sources. Wilson replied, he did not have a problem with Jacobs' reporting of the corruption.
46. Wilson also admitted Jacobs was being "victimized" by the DAO.
47. Jacobs asked Wilson to refer his corruption allegations to the United States Attorney ("US Attorney").
48. Wilson asked Jacobs to first contact the Attorney General's Office ("AGO").
49. Jacobs informed Wilson there was a conflict of interest with the AGO because of their involvement in the Pownall OIS investigation.
50. Immediately after the meeting in Wilson's office, Jacobs contacted Hendershot and informed him of the entire contents of the meeting.
51. Jacobs asked Hendershot for a supervisor in the AGO because of Wilson's request that Jacobs contact AGO before referring the matter to the US Attorney.
52. Hendershot provided Jacobs a supervisor's number and Jacobs immediately contacted the supervisor.

53. The supervisor informed Jacobs of the conflict of interest.
54. Jacobs told Hendershot what the supervisor in the AGO stated and asked Hendershot to relay the comments to Wilson so the he [Wilson] could refer the criminal activity at the DAO to the US Attorney for investigation.
55. Jacobs asked Hendershot EVERYDAY they worked together if he contacted Wilson and if Wilson referred Jacobs' corruption allegations to the US Attorney.
56. Every time Jacobs asked, Hendershot replied he had not heard from Wilson regarding Jacobs' request.
57. Jacobs did not know at this time that a conspiracy had already been formed by Defendants to violate his constitutionally protected rights.
58. Jacobs later learned of the agreement/conspiracy among Defendants during deposition testimony and other evidentiary items.
59. On January 14, 2020 Jacobs went to the PA Disciplinary Board for an interview regarding his corruption allegations against the DAO.
60. Jacobs informed Hendershot of the interview.
61. On January 18, 2020 Jacobs participated in a taped podcast.
62. Prior to the podcast (January 17, 2020) Jacobs informed his Commanding Officer, Jason Hendershot that he would be discussing his litigation and criminal activity at the DAO.
63. During the podcast Jacobs discussed his litigation and the criminal activity being committed against him by the DAO.
64. During the podcast Jacobs stated the DAO was operating like a "criminal enterprise" and was a "clear and present danger" to the public.
65. On January 20, 2020, Jacobs informed Hendershot of his participation in the podcast and the topics of discussion.
66. On January 21, 2020, Hendershot informed Jacobs that Deputy Police Commissioner Dennis Wilson was taking Jacobs to "the front" (disciplinary action) for Jacobs' participation in the podcast.
67. An irate Jacobs informed Hendershot he has been asking Hendershot to contact Wilson for almost two months about reporting the DAO corruption to the US Attorney and the first response from Wilson is to retaliate against Jacobs for

publicly reporting the corruption. *Note: The podcast was not publicly available on January 21, 2020.*

68. Hendershot replied, you didn't do anything wrong, the most he [Wilson] could give you is a "counseling memo."
69. Jacobs told Hendershot the Deputy Police Commissioner does not request discipline for a "counseling memo."
70. On January 24, 2020, Jacobs contacted Hendershot and informed him he contacted the FOP for representation and inquired if he received the Action and Report request from Wilson requesting disciplinary action against Jacobs.
71. Hendershot replied, he had not received the action and report and "Maybe there won't be one."
72. On January 27, 2020, Hendershot informed Jacobs he received Wilson's request for disciplinary action against Jacobs.
73. On January 27, 2020 Jacobs immediately authored a memorandum to Wilson.
74. The memorandum indicated Wilson was retaliating against Jacobs as a result of Jacobs reporting criminal activity at the Philadelphia District Attorney's Office ("DAO").
75. The memorandum also informed Wilson he was conspiring in the criminal activity with the DAO.
76. On January 29, 2020 Defendants Jason Hendershot, Frank Vanore, Dennis Wilson, and Kia Ghee (attorney for Krasner conspired to retaliate against Jacobs by fabricating that Jacobs violated department policy by violating department directives. Hendershot sent Krasner's attorney [Ghee] questions to use against Jacobs and wanted her "advice."
77. On January 30, 2020 Hendershot conducted a disciplinary interview of Jacobs.
78. Prior to the disciplinary interview Hendershot informed Plaintiff that Vanore informed him Wilson was taking disciplinary action against Plaintiff in retaliation for Plaintiff filing lawsuits against Krasner and Wilson.
79. On February 3, 2020 Hendershot submitted a memorandum requesting disciplinary action against Jacobs on fabricated departmental charges.

80. Jacobs took off work from Friday, January 31, 2020 until Friday, February 7, 2020 to avoid further retaliatory activity.

81. After two scheduled days off ("SDO") Jacobs returned to work on February 10, 2020.

82. Immediately upon Plaintiff's return to work (February 10, 2020) Defendants informed Jacobs he was being charged with Conduct Unbecoming an Officer "UNSPECIFIED," with a penalty that could result in immediate termination for reporting corruption.

83. On February 10, 2020 Jacobs immediately authored a memorandum to new Philadelphia Police Commissioner Danielle Outlaw.

84. Jacobs titled the memorandum as an "urgent matter" and asked Commissioner Outlaw for a meeting to discuss the criminal actions being committed against him.

85. On February 11, 2020 at approximately 12:50PM Defendants served Jacobs with the disciplinary documents.

86. On February 11, 2020 at approximately 1:00PM Jacobs received the disciplinary documents.

87. On February 11, 2020 at approximately 1:01PM Jacobs plead not guilty.

88. On February 11, 2020 at approximately 1:07PM DF Pace approved the charges against Jacobs.

89. On February 13, 2020, Jacobs learned Defendants [Wilson] had a meeting with new Police Commissioner Danielle Outlaw and they planned to take Commissioner's Direct Action ("CDA") and terminate Jacobs' immediately upon his return to work.

90. On March 3, 2020 Plaintiff filed a response to Defendants' Motion to Dismiss *19-cv-4616 Document 14.* Included with the filing was a copy of Plaintiff's disciplinary interview (January 30, 2020) in which Plaintiff clearly stated this was retaliation for him being a "Whistleblower" reporting corruption at the Philadelphia District Attorney's Office ("DAO"), which Plaintiff indicated he repeatedly reported to his superiors.

Q. Do you wish to add anything else to this statement?
A. Yes, I would like to say that I realize I was compelled to answer these questions during this interview, or I would have been charged with Section 1-008-10 and 1-009-10 of the disciplinary code.

I would like to reiterate that I am a Whistle Blower into corruption at the Philadelphia District Attorney's Office. I have informed on several occasions, via personal correspondence, email, and memorandum, which was addressed to PC Coulter, as well as D/C Wilson of these corruption allegations. To date, they have not, to my knowledge started an investigation into this corruption, but swiftly they have started an investigation against me, the Whistle Blower.

At this time, I would like to ask PC Coulter and D/C Wilson again to refer these allegations to the United States Attorney's Office.

STATEMENT CONCLUDED: 1:00 PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (3) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

NAME (print): DETECTIVE DERRICK JACOBS

SIGNATURE: [signature] #9115

UNIT: OISI

DATE & TIME: 1/30/2020 1:29PM

WITNESSES: [signatures]

3

91. In retaliation on March 3, 2020 Hendershot confiscated Jacobs' police vehicle. Jacobs could not respond to any assignments as a result.

92. On March 4, 2020, Hendershot and Vanore conspired and fabricated an email and that requested Jacobs' removal from the Officer Involved Shooting Investigation Unit ('OISI").

93. Hendershot and Vanore then conspired to constructively discharge Plaintiff by accessing his personnel records to see when Plaintiff's accrued sick, vacation, and holiday time would run out and he would be forced to retire. Hendershot and Vanore learned that Jacobs would run out of time in March 2021. If Jacobs returned to worked any day he would be immediately terminated by Commissioner's Direct Action ("CDA") from Philadelphia Police Commissioner Danielle Outlaw.

94. On March 6, 2020, Plaintiff sent a memorandum "up the chain" to Police Commissioner Danielle Outlaw. The memorandum referenced the previous memorandum sent on February 10, 2020 requesting "Whistleblower" protections and the criminal and departmental retaliatory actions being committed against Plaintiff as the result of Plaintiff being a Whistleblower and reporting corruption.

95. Plaintiff subsequently authored memorandums to Philadelphia Police Commissioner Danielle Outlaw asking if he was in danger of having Commissioner's Direct Action ("CDA") inflicted upon him when he returned to work and his employment terminated.

96. Defendants (Hendershot, Vanore, Wilson, and Ghee) violated departmental policy and retaliated against Plaintiff by intercepting the memorandums and not forwarding them to Police Commissioner Danielle Outlaw, denying Plaintiff whistleblower protections. Defendants provided other defendants Plaintiff's stolen memorandums.

97. On August 3, 2020, Plaintiff submitted another memorandum up the chain addressing her failure to respond to the PPD criminal activity against Plaintiff as a result of Plaintiff being a whistleblower.

98. After not receiving a response, on August 18, 2020, Plaintiff resent the August 3, 2020 memorandum directly to Police Commissioner Outlaw at danielle.outlaw@phila.gov.

99. On August 26, 2020, Police Commissioner Outlaw responded to Plaintiff's memorandum. Outlaw informed Plaintiff she has NEVER received any of Plaintiff's previous correspondences (in violation of departmental policy). Outlaw further informed Plaintiff due to his litigation, she could not address the PPD illegal activity and told Plaintiff to contact Defendants' attorney (Jennifer MacNaughton).

100. Plaintiff informed Commissioner Outlaw she was conflating the criminal activity with Plaintiff's litigation. Plaintiff contacted Jennifer MacNaughton for clarity. Plaintiff addressed email to both Jennifer MacNaughton and Commissioner Outlaw. Plaintiff informed Outlaw of his knowledge of her intentions of taking Commissioner's Direct Action ("CDA") in retaliation and terminating his employment.

101. Outlaw never denied her intentions of taking CDA in retaliation for Plaintiff exposing corruption.

102. On September 1, 2020, Jennifer MacNaughton responded to both Plaintiff and Commissioner Outlaw, and confirmed Plaintiff's concerns.

103. Plaintiff thanked MacNaughton for her confirmation and clarity. Outlaw did not respond.

104. On September 24, 2020 Plaintiff sent a memorandum directly to Commissioner Outlaw. The memorandum informed Outlaw that as a result of the retaliation against Plaintiff for reporting corruption, Plaintiff has been forced to used hundreds of hours of his time because of her intentions to take CDA and terminate Plaintiff upon his return to work. Plaintiff begged Outlaw for an intervention regarding retaliation against Plaintiff.

105. On October 6, 2020, after not receiving a response from the Police Commissioner Outlaw (*Note: A violation of departmental policy),* Plaintiff authored another memorandum and plea to Commissioner Outlaw.

106. In response, *and in violation of departmental policy, Lieutenant Patrick Quinn issued a threatening email to Plaintiff on October 9, 2020 from email address* *Police.Commissioner@phila.gov*. Quinn indicated if Plaintiff continued to request assistance and mitigation against the retaliation being committed

against him for reporting corruption from Philadelphia Police Commissioner Danielle Outlaw, Plaintiff would be disciplined.

107. On March 12, 2021, due to the inability to return to work without immediately being terminated, Plaintiff was constructively discharged and forced into retirement.

108. On May 25, 2023, Plaintiff held a telephone conference with City Solicitor Nicole Morris after informing and showing Morris Defendants Vanore and Hendershot falsified Daily Attendance Reports ("DAR") to retaliate and constructively discharge Plaintiff.

109. The conference was regarding *Jacobs v. City of Philadelphia 19-cv-4615.*

110. During the conference Jacobs in an attempt to reserve judicial resources asked Morris about the settlement of all claims by Jacobs.

111. After Jacobs asked about being "made whole," Morris responded that Jacobs would not be made whole and "REINSTATEMENT IS NOT AN OPTION."

112. When Jacobs informed Morris he was a decorated officer and why would reinstatement not be an option, Morris responded "THAT'S NOT SOMETHING THE DEPARTMENT IS WILLING TO DO."

113. When Morris made those statements she was Deputy City Solicitor.

114. When Morris made those statements she knew/observed a fabricated DAR, which is a criminal offense, made by Vanore and Hendershot in retaliation for Jacobs exposing corruption.

115. When Morris made those statements she knew, along with Kia Ghee, Jacobs never revealed confidential police information. Morris knew the allegations were fabricated in retaliation for Jacobs exposing corruption.

116. When Morris made those statements she knew the "grand jury leak" story was a fabtication/lie used to retaliate against Jacobs for exposing corruption.

117. Defendants DENIAL of Jacobs reinstatement, who was a decorated Law Enforcement Officer, is retaliation for Jacobs exposing corruption.

118. On October 20, 2025 Plaintiff applied for reinstatement to the Philadelphia Police Department ("PPD") in accordance with Philadelphia Civil Service regulations.

To: Philadelphia Civil Service Commission

Municipal Services Building

16th Floor

1401 John F. Kennedy Blvd.

Philadelphia, PA 19102

Fax: (215) 686-2374

From: Detective Derrick Jacobs #9116, Payroll #223879

Date: October 20, 2025

**Subject: Reinstatement**

Detective Derrick Jacobs #9116, Payroll #223879 requests reinstatement to his former position of Philadelphia Police Detective in accordance with Philadelphia Civil Service Regulations.

Detective Derrick Jacobs #9116, Payroll #223879 separation date was March 12, 2021.

I appreciate all attention to the above matter.

Derrick Jacobs #9116

Payroll 223879

1230 N 15th Street

Philadelphia, PA 19121

Cc: Philadelphia Fraternal Order of Police ("FOP") Lodge 5

FOP Lodge 5 Vice President (Labor Relations) John R. McGrody

119. On October 23, 2025 Philadelphia Police Personnel informed Plaintiff the necessary requirements for reinstatement.

120. Plaintiff completed all necessary requirements by January 9, 2026.

121. On March 9, 2026 the Philadelphia Police Department (Philadelphia Police Commissioner Kevin Bethel) denied Plaintiff's reinstatement.

7/23/26, 11:04 AM Gmail - Reinstatement Denied

Gmail Derrick Jacobs <derrickjacobs9116@gmail.com>

**Reinstatement Denied**

2 messages

**Patricia Sullivan** <Patricia.Sullivan@phila.gov> Mon, Mar 9, 2026 at 1:28 PM

To: "derrickjacobs9116@gmail.com" <derrickjacobs9116@gmail.com>

Afternoon,

Police HR has just received your file back from the Police Commissioner's Office. We are sorry to inform you that he has denied your request for reinstatement. No reason was given, but if you would like reconsideration by the Commissioner or a reason as to why your reinstatement was denied you can send a letter to his office at below address. A formal letter will be sent to your home through US mail.

**Philadelphia Police Department**
**Kevin J. Bethel**
**Police Commissioner**
**400 N. Broad Street**
**Suit 19**
**Philadelphia, PA 19130**

Thank you

Patricia Sullivan

***Administrative Services Supervisor/FMLA and Reinstatements***

***Police Human Resources Unit***

***Police Public Services Building***

***400 N. Broad Street- Suite 07-E-0001***

***Philadelphia, PA 19130***

***215-686-3372/3373 (phone)***

***Ext. 18362***

***215-686-3019 (fax)***

**patricia.sullivan@phila.gov**

**Derrick Jacobs** <derrickjacobs9116@gmail.com> Mon, Mar 9, 2026 at 3:05 PM

To: Patricia Sullivan <Patricia.Sullivan@phila.gov>

Patricia, thank you very much for getting back to me.

I really appreciate your professionalism and service in this matter.

I will send the requests for reconsideration and reason for denial requests as soon as possible.

https://mail.google.com/mail/u/0/?ik=a2644f389d&view=pt&search=all&permthid=thread-f:1859206296388105134&simpl=msg-f:18592062963881O513... 1/2

122. Defendants did not provide a reason for the denial of reinstatement.

123. On March 10, 2026 Plaintiff submitted a request for reconsideration and/or justification of PPD denial for reinstatement to Philadelphia Police Commissioner Kevin Bethel.

To: Philadelphia Police Commissioner Kevin Bethel

From: Derrick Jacobs

Date: March 10, 2026

Subject: Request for reconsideration and/or justification for denial of request for reinstatement to the Philadelphia Police Department.

Dear Commissioner Bethel:

As someone who has served the Philadelphia Police Department honorably for more than two decades, I find it disheartening and perplexing that my request for reinstatement was denied by you, according to Philadelphia Police Lieutenant James Ferguson from your office.

At the time of my retirement, I was arguably the most decorated Philadelphia Police Detective in Philadelphia Police Department history. My superiors informed me that I was in the top one percent (1%) of Philadelphia Police Detectives.

As one of only two Detectives with my employment record and experience in the Detective Division, I cannot fathom any justification for denial of my experience and service.

At your earliest convenience, could you please reconsider your denial of my request for reinstatement and/or provide justification for denial.

Respectfully,

Derrick Jacobs

March 10, 2026

124. Defendants never responded to Plaintiff's request for reconsideration and did not provide justification for denial of reinstatement.

125. Lieutenant James Ferguson "held on" to Plaintiff's request for reinstatement in an attempt have reinstatement period expire.

126. Plaintiff prays/seeks immediate relief from Defendants' retaliatory actions as recent events have proven Plaintiff's "WHISTLEBLOWER" allegations.

127. The Pennsylvania Supreme Court in a recent OPINION has concluded Plaintiff's allegations were/are a matter of public concern.

128. The Third Circuit Court of Appeals has concluded Plaintiff's allegations were/are a matter of public concern.

129. Upon information and belief United States District Court Judge Paul S. Diamond will conclude Plaintiff's allegations are a matter of public concern.

130. On November 26, 2019 Plaintiff personally provided in "great detail the corruption and criminality" at the Philadelphia District Attorney's Office to then Deputy Philadelphia Police Commissioner Dennis Wilson.

131. Afterwards, Wilson conspired with Defendants Vanore, Pace, and Hendershot to initiate disciplinary action against Plaintiff and charge him with Conduct Unbecoming an Officer, which carries a penalty of termination of employment.

132. ***Deposition of former Philadelphia Police Commissioner Christine Coulter:*** During a deposition on April 28, 2022 (*see Jacobs v. City of Philadelphia 19-cv-4615)* Coulter testified she received correspondence on or about October 4, 2019 from Plaintiff requesting Whistleblower protections. Coulter testified she took the request seriously and was informed by then City Solicitor Marcel Pratt (who held regular meetings with Lawrence Krasner regarding Plaintiff) that Plaintiff was NOT entitled to "Whistleblower" protections because Krasner was not Plaintiff's boss. Coulter also testified she immediately informed Deputy Police Commissioner Wilson and ordered him to inform Plaintiff, which he did not. Coulter further testified Wilson NEVER informed her he was taking disciplinary action against Plaintiff and "HE SHOULD HAVE" and she can think of NO REASON why he did not. Coulter

stated she wanted to explore other avenues to protect Plaintiff. *Note: Coulter was demoted after her deposition with Plaintiff by Defendant Outlaw.*

133. ***Deposition of Plaintiff's former Commanding Officer Lieutenant Jason Hendershot:***



BY MR. JACOBS:
Q. The timeline is different than what you are alleging here, Lieutenant.
MR. GONZALES: You're making a statement. I said ask a question.
BY MR. JACOBS:
Q. When did Deputy Commissioner Wilson contact you?
MR. GONZALES: About what?
MR. JACOBS: He just said at the time he brought it up and it was during that time. I'm going to be respectful, so that you may put a date on the record. Because at this time you were not a party to this litigation.
MR. GONZALES: All I asked is --
BY MR. JACOBS:
Q. The question was, did you inform Deputy Commissioner Wilson that Tracy Tripp -- what Tracy Tripp was alleging did not happen? That the Plaintiff did not leak grand jury information?
A. I did inform him of that in my opinion.
Q. Did you inform him of that in September of 2018?
A. I don't remember the exact time. The

Q. But you knew that what she was alleging wasn't true; is that correct?

A. Yes.

Q. But the Philadelphia Police Department allowed her to continue with this farce and stress out their employees; is that correct?

BY MR. JACOBS:

Q. And you also don't know whether or not that information is publicly available, do you?

A. I thought it was confidential. I just didn't know. I guess I was wrong.

Q. Oh, you were wrong. Meanwhile, I sit here unemployed because you were wrong; is that correct?

134. ***Deposition of Philadelphia Police Inspector D.F. Pace***



Q. Did you know whether any of the statements that Jacobs made were true or false?

A. I listened to the entire podcast and I heard your voice make those statements.

Q. That's not the issue here. The issue is the statements that were made on the podcast, did you have any reason to believe that those statements were false?

MR. GONZALES: Objection. Argumentative. I'll let the witness answer if he can.

THE WITNESS: It's immaterial to me whether the statements were false or not. The statements were made and they were egregious statements. And they violated your obligations as a detective to make those statements.

For example, referring to the district attorney as a criminal, running a criminal enterprise, referring to him as the Don. These are some things that I recall from my reading of your statements. But I stand by the explanations that I included under each charge that I levied against you in this

1-§021.

Q. What is that charge?

A. I'll read it again. Any incident, conduct, or course of conduct which indicates an employee has little or no regard for his or her responsibility as a member of the police department.

Q. So that's not shooting someone, right?

A. Shooting someone could potentially also bring that charge. It depends on the circumstances. Generally not. Shooting someone unlawfully or abusing their authority or an excessive use of force would probably be under that -- there's entire categories where those charges are listed. So I would more likely charge that. It would depend on the reason for what the shooting would occur to use your example here. But that's the best I can answer that question.

Q. You left the Police Board of Inquiry and went to night commander; is that correct?

A. That's correct.

Q. And subsequently you left the Philadelphia Police Department for a little while; is that correct?

A. That's correct.

Q. And it was a result of being named in a lawsuit, this lawsuit, and your dispute with Inspector Nash with approving charges at the PBI and being named in the lawsuit; is that correct?

MR. GONZALES: I'm going to object and instruct the witness not to answer. The court has already instructed you, Mr. Jacobs, that any questions related to this topic are outside the bounds of discovery in this case and are to be prohibited?

BY MR. JACOBS:

Q. I want to on get the record that he left the police department and the PBI because he was a named litigant in this lawsuit and he disagreed with it.

MR. GONZALES: You're not putting anything on any record. You're just stating things that are coming from your mouth and I'm instructing the witness not to answer. The court has already ruled on this in his October 5, 2023 order.

MR. JACOBS: We'll meet with the court tomorrow. So we'll discuss it again.

MR. GONZALES: Yep.



*Note: Defendant Pace, who is a lawyer by the way, considers the Plaintiff exposing the destruction of the criminal justice system with criminal activity "immaterial."*

**COUNT ONE**

**FIRST AMENDMENT RETALIATION**

Plaintiff incorporates all preceding paragraphs as if fully set herein.

As a result of Plaintiff's reporting of corruption on matters of public concern within the Philadelphia District Attorney's Office and Philadelphia Police Department, Defendants conspired to retaliate against Plaintiff through numerous adverse employment actions, including but not limited to, the most recent adverse employment action of denying Plaintiff reinstatement on March 9, 2026 after previous constructive discharge. Defendants took adverse employment actions against Plaintiff that were sufficient to deter a person of ordinary firmness from exercising their constitutional rights. Plaintiff's protected speech was a substantial and/or motivating factor in Defendants' decision, which Defendants admit. Retaliatory action was a direct and proximate result of Plaintiff's whistleblowing. Plaintiff has suffered economic loss, emotional distress, and damage to his professional reputation.

As a result of Plaintiff's reporting of public corruption and criminal activity, Defendants retaliated and conspired to make conditions of employment so intolerable for Plaintiff as a result of him exposing "unprecedented" acts of public corruption. Defendants threatened to immediately terminate Plaintiff if and/or when he returned to work forcing his "constructive discharge" through retirement. Defendants then denied Plaintiff, a highly decorated law enforcement officer, reinstatement in retaliation. *See Feldman v. Philadelphia Housing Authority 43 F.3d 823 (3rd Cir. 1995). Also See Hill v. Borough of Kutztown 455 F.3d 225 (3d Cir. 2006).*

**COUNT TWO**

**FOURTEENTH AMENDMENT DUE PROCESS**

Plaintiff incorporates preceding paragraphs as if fully set herein. Plaintiff had a protected property interest in his employment and/or reinstatement to his position from state law, employment contract, collective bargaining, etc.

Defendants, acting under color of state law, deprived Plaintiff of this protected property interest through constructive discharge and, as a separate and discrete act, the subsequent denial of reinstatement. *See Nicholas v. Pennsylvania State University 277 F.3d 133 (3d Cir. 2000) also See Goss v. Exxon Office Systems Co. 747 F.2d 885 (3d Cir. 1984).*

Defendants failed to provide Plaintiff with adequate notice and an opportunity to be heard prior to or subsequent to these deprivations, thereby violating rights to procedural due process under the Fourteenth Amendment.

Defendants do not deny they commenced disciplinary action against Plaintiff after he reported corruption and criminal activity. Every time Plaintiff reported for work he was greeted with a disciplinary action by Defendants after exposing their corruption. Three (3) days, three disciplinary actions. When Plaintiff attempted to avoid termination, he repeatedly asked then Philadelphia Police Commissioner Danielle Outlaw if she would take Commissioner's Direct Action ("CDA") and terminate him upon his return. Defendants (Wilson, Vanore, and Hendershot) intercepted and destroyed correspondence addressing these concerns to Commissioner Outlaw. Defendants Wilson, Vanore, and Hendershot then fabricated departmental emails/documents and calculated the exact month of Plaintiff's "constructive discharge" based upon Plaintiff's depletion of his accrued vacation, sick, and holiday time. Defendants knew the "exact" month a year in advance of when Plaintiff would be "forced" into retirement. Plaintiff then sent correspondence directly to Commissioner Outlaw regarding previously submitted correspondences and asked if she intended to take CDA against Plaintiff. Commissioner Outlaw denied receiving previously submitted correspondences

(confirming interception by Defendants) and did not address the question of CDA. Defendant Quinn threatened Plaintiff if he [Plaintiff] continued to contact Commissioner Outlaw. *See Nicholas v. Pennsylvania State University 277 F.3d 133 (3d Cir. 2000).*

**COUNT THREE**

**VIOLATION OF PENNSYLVANIA WHISTTLEBLOWER LAW ("PWL") AND FEDERAL WHISTLEBLOWER LAW**

Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

Plaintiff was an employee of the City of Philadelphia (Philadelphia Police Department).

Plaintiff made a good faith report of wrongdoing and/or waste to his employer or an appropriate authority as define by the Pennsylvania Whistleblower Law ("PWL").

Defendants, through their agents and employees, retaliated against Plaintiff by constructively discharging Plaintiff and as a separate and discrete act, denying Plaintiff reinstatement among other adverse actions, because Plaintiff made a good faith report of wrongdoing and/or waste.

The fabricated criminal investigation, departmental disciplinary charges, and the subsequent separate denial of reinstatement, each constitute independently actionable violations of PWL.

**Pennsylvania Whistleblower Law defined:** *"A person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."*

*"No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act."*

A refusal to reinstate is viewed as a discrete retaliatory act. If an employee applies for reinstatement or rehire and is denied because they previously blew the whistle, that denial is a new, actionable instance of retaliation, separate from any previous adverse actions (like an initial termination).

Third Circuit has noted that ***reinstatement and its denial must be carefully scrutinized.*** If an employer actively denies reinstatement not for legitimate business reasons, but as a punitive measure for "whistleblowing," it falls squarely within the prohibition against discriminating regarding the "privileges of employment." *See Squires v. Bonser F.3d 1268 (3d Cir. 1995)*

After exposing public corruption Plaintiff was retaliated against and charged with Conduct Unbecoming an Officer and constructively discharged. Defendant Pace stated during a deposition that it did not matter whether Jacobs was telling the truth regarding his reporting of corruption. Pace stated it was "immaterial" whether Jacobs' statements were "true of false" and he "stands by" the charges levied against Plaintiff for reporting corruption. Disciplinary action followed by denial of reinstatement is valid claim of retaliation under PWL. *See Freeman v. McKellar, 795 F. Supp 733 (E.D. Pa. 1992).*

For over a year Plaintiff [Jacobs] had been informing his superiors the Philadelphia District Attorney's Office ("DAO") had been engaged in criminal activity under District Attorney Lawrence Krasner. The criminal activity included, but was not limited to, soliciting perjury, falsifying affidavits, and intentionally misleading Courts. Jacobs' Commanding Officer Jason Hendershot confirmed Jacobs reporting of his concerns of corruption to his superiors during a deposition. An example of some of the DAO criminal actions under Krasner's policies and orders included, but were not limited to, the illegal arrest of Law Enforcement Officers, the release convicted murderers so they could sue the City of Philadelphia after being released, and the removal of convicted killers (particularly Mumia Abu Jamal) from death row. After Plaintiff filed a federal civil complaint (19-cv-4616) on October 4, 2019, Deputy Philadelphia Police Commissioner Dennis Wilson ordered Jacobs' Commanding Officer Jason Hendershot to spy on his subordinate [Jacobs] and report his observations to

Defendants though Defendant Kia Ghee. On November 18, 2019, Ralph Cipriano of bigtrial.net published an article regarding Plaintiff's federal civil complaint. Immediately on that same date Defendants shut off Plaintiff's mobile communications and threatened to take his police issued vehicle, but declined after Plaintiff told Defendants it was retaliation for his federal civil complaint(s). On January 18, 2020, Plaintiff went public on a podcast and discussed his federal civil complaint and the criminal actions being perpetrated against him personally for exposing criminal activity at the DAO. The now FACTUAL statements that the DAO under Krasner is being ran "like a criminal enterprise." Immediately after exposing the criminal actions committed against him [Plaintiff] and the citizens of Philadelphia, Defendants charged Plaintiff with Conduct Unbecoming an Officer in ONE (1) day. *Note: Plaintiff attempted to retain his employment by using his accrued time. Immediately and upon every return, Defendants retaliated with a disciplinary action forcing the constructive discharge.* Defendant Pace confirmed this by indicating Plaintiff's exposing corruption was "egregious." *See Feldman v. Philadelphia Housing Authority 43 F.3d 823 (3rd Cir. 1995).*

It is no longer a question that since 2018 the Plaintiff was/is a "Whistleblower." The Pennsylvania Supreme Court, The Pennsylvania Attorney General, The Third Circuit Court of Appeals and currently in Judge Paul S. Diamond courtroom (14A), have confirmed Plaintiff's allegations of corruption and criminality at the DAO under Krasner. Also confirmed are Krasner's stated "consequences" of not "protecting the office" from the exposure of the "corruption and criminality," consequences that are punitive and retaliatory policies, practices, and customs.[2]

[2] In a Notice of Conflict filed on July 20, 2026 in the matter of Dennis Johnson v. Scott Nickelson (15-cv-4965, ECF 135) Assistant District Attorneys Steven J. Wildberger and Katherine E. Ernst confirmed allegations being made by Jacobs for over eight years. ADAs Wildberger and Ernst stated on June 25, 2026 Krasner personally ordered them to mislead the Court (Judge Paul S. Diamond) to "protect the office" or there would be "consequences." Now if that's not synonymous with the "Don" (Krasner) telling members (ADAs) to protect La Cosa Nostra (the office) or you will be "whacked" (consequences) I don't know what is. *Note: During a July 17, 2026 evidentiary hearing in Judge Diamond's courtroom (14A) former Assistant District Attorney Jaclyn Mason testif*ied "the office" wanted her to mislead the Court and Assistant District Attorney Matthew Stiegler (capo) intentionally lied on the witness stand to "protect the office."

**Federal Whistleblower Law 5 U.S.C. §2302 (b)(8)(A)** *provides that a federal agency may not take a "personnel action" with respect to any "employee or applicant" for employment because of any disclosure of information by an employee or applicant which the employee or applicant reasonably evidences*

(i) Any violation of any law, rule, or regulation, or

*(ii)* Gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

In *Murray v. UBS Securities, LLC 601 U.S. (2024)* The Supreme Court ruled no retaliatory intent is needed; Whistleblower only needs to prove denial was a "contributing factor" in response to protected activity. Although the denial is obviously retaliation against protected activity, Plaintiff can prevail without it.

In *DHS v. MacLean 574 U.S. 383 (2015)* The Supreme Court ruled Plaintiff can prevail and has the right to reinstatement even in violation of agency rules. Although Plaintiff did not violate departmental policies, If Defendants' argument is the Plaintiff did, Plaintiff is still entitled to reinstatement as a "Whistleblower."

In *Robinson v. Shell Oil Co., 519 U.S. 337 (1997)* The Supreme Court ruled denial of reinstatement is a valid claim for former employees. The Court ruled the term "employee" includes "former employees." This protects Whistleblowers from the burden of corrupt officials refusing to reinstate and/or rehire in retaliation.

In *Brock v. Roadway Express Inc., 481 U.S. 252 (1987)* Allows for the preliminary reinstatement during litigation.

**COUNT FOUR**

**CONSPIRACY**

Defendants agreed to engage in malicious actions targeting Plaintiff's employment in retaliation for Plaintiff's exposing Defendants' corruption and criminal activity. Defendant Hendershot testified he was ordered to spy on Plaintiff by Defendant Wilson and report back to other Defendants. Defendants (superiors and public officials) then used the "acquired" information to fabricate

and retaliate against Plaintiff for exposing public corruption. Defendants then conspired to deny Plaintiff reinstatement without validation and/or explanation.

**COUNT FIVE**

**MONELL CLAIM FOR MUNICIPAL LIABILITY**

The retaliatory actions taken against Plaintiff were the result of an official policy, practice, or custom of the City of Philadelphia to silence "Whistleblowers" and protect corrupt officials. Philadelphia Police Commissioner Kevin Bethel, *former* Philadelphia Police Commissioner Danielle Outlaw, City Solicitor Marcel Pratt, and Philadelphia District Attorney Lawrence Krasner are/were "policymakers" for the City of Philadelphia. The "policymakers" conspired to retaliate against Plaintiff for exposing "massive" and "unprecedented" public corruption that has pilfered and/or cost the citizens of Philadelphia an estimated two hundred million dollars. Krasner has threatened "consequences" for anyone exposing his policies of corruption. Plaintiff exposed and/or attempted to expose this corruption and has received the "consequences" from the conspired "policies" of retaliation. *See Freeman v. McKellar, 795 F. Supp. 733 (E.D. Pa. 1992)*, *Dougherty v. School District of Philadelphia (3d Cir. 2014), Ridgeway v. School District of Philadelphia (E.D. Pa. 2026), and Cucchi v. Kagel (E.D. Pa. 2018).*

In 2018 Jacobs informed his superior(s) (Commanding Officer Lieutenant Jason Hendershot) of several acts of corruption and criminality at the DAO under newly elected District Attorney Lawrence Krasner. What Jacobs did not know at the time was Jacobs' Commanding Officer and the person Jacobs was reporting the criminal activity to, was also part of the criminal activity. Jacobs would later learn Hendershot had prepared the arrest warrant (Arrest Warrant Number 285380 on August 30, 2018) to arrest Philadelphia Police Officer Ryan Pownall. *Note: Hendershot never informed anyone in the Officer Involved Shooting Investigation Unit ("OISI") he prepared the arrest warrant to illegally arrest Pownall. Once Hendershot superiors learned of his involvement in the illegal Pownall arrest, they confronted Hendershot. Defendant, Deputy Police Commissioner Dennis*

*Wilson immediately transferred Hendershot's superiors and replaced them with Vanore and Naish or orders from Krasner.*

Jacobs learned Philadelphia District Attorney Lawrence Krasner engaged in a scheme to target sworn law enforcement officers and former prosecutors. The scheme included arresting and defaming the sworn law enforcement officers and former prosecutors. The scheme included releasing convicted murderers from prison. The scheme included removing convicted murderers from death row. The scheme included pilfering millions of dollars from the taxpaying citizens of Philadelphia with the assistance of defense lawyers and The Philadelphia City Solicitor's Office, headed then by City Solicitor Marcel Pratt. Krasner and Pratt were both "policymakers" for the City of Philadelphia, a municipality. When the "policymakers" (Krasner and Pratt) learned Jacobs was exposing their corruption and criminality they contacted Deputy Police Commissioner Dennis Wilson and ordered him to spy on Jacobs. Jacobs requested "Whistleblower" protections from Defendants' criminal activity from then policymaker, Philadelphia Police Commissioner Christine Coulter. Coulter informed Plaintiff Defendant and policymaker Pratt informed her Plaintiff "WAS NOT" a "Whistleblower" because he was reporting corruption and criminality at Krasner's DAO. After an article on bigtrial.net Defendant Wilson summoned Plaintiff to his office and informed Plaintiff the Philadelphia Police Department ("PPD") cannot protect Plaintiff from the "victimization" by the DAO. Two months later and without informing Philadelphia Police Commissioner Christine Coulter, who Plaintiff had requested "Whistleblower" protections from, Defendants fabricated departmental policy violations against Plaintiff and threatened him with termination in response to Plaintiff exposing corruption and criminal activity. Defendants then conspired to terminate Plaintiff immediately when/if he returned to his employment through Commissioner's Direct Action ("CDA"). Finally, Defendant ("policymaker") Philadelphia Police Commissioner Kevin Bethel) DENIED the decorated "Whistleblower" reinstatement on March 9, 2026. PWL considers this a separate discrete action of whistleblower retaliation with a 180 day window. On March 10,

2026 Plaintiff submitted a memorandum to Defendants requesting reconsideration/justification for the denial. Plaintiff waited 120 days for a response. Defendants never responded. *Note: Defendants Wilson, Hendershot, and Pace all testified during depositions they never investigated if Plaintiff violated departmental policy before charging him with Conduct Unbecoming an Officer.*

## CONCLUSION

**There is no question now the DAO under Krasner engaged in corruption and criminal activity.**

**There is no question now the DAO threatened consequences to anyone who exposed that corruption and criminal activity.**

**There is no question the corruption and criminal activity has cost the tax-paying citizens of Philadelphia millions of dollars.**

**There is no question that tens of convicted murderers were illegally released and made millionaires as a result.**

**There is no question the DAO under Krasner illegally arrested sworn law enforcement officers.**

**There is no question the DAO under Krasner lied, cheated, mislead, falsified, and destroyed evidence presented to the Courts.**

**There is no question Plaintiff was the first to expose this corruption and criminal activity and as a result was the first to receive the promised "consequences" of retaliation.**

**The question is why did the City of Philadelphia acquiesce to this corruption and criminal activity?**

**The question is why did the Defendants constructively discharge the decorated law enforcement officer exposing this corruption and criminal activity?**

**The question is why did the Defendants refused/deny reinstatement of this decorated officer?**
**The question is will Philadelphia District Attorney Lawrence "Larry" Krasner share a Federal prison cell with the other megalomaniac disgraced Dr. Anthony Fauci?** *Note: Former Philadelphia District Attorney Rufus "Seth" Williams went to federal prison for corruption, which Lawrence Krasner constantly references. Krasner's crimes and what he has done to the criminal justice and legal system are exponentially worse.*

**Finally, there is no question the only reason the highly decorated law enforcement officer was not reinstated on March 9, 2026 was in retaliation for him [Jacobs] exposing corruption.**

*Note: One month later (April 2026) Philadelphia Police Commissioner Kevin Bethel and other high ranking PPD officials testified before City Council the PPD is facing a deficit of over 1200 Officers.* **Previously obtained expert report attached as Exhibit "A".**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor and against Defendants, and award the following relief:

a. A declaratory judgment that Defendants violated Plaintiff's rights;
b. Injunctive relief, including an order directing Defendants to immediately reinstate Plaintiff to a comparable position;
c. An award of back pay, with prejudgment interest, from the date of constructive discharge to the date of judgment;
d. An award of front pay, in lieu of or in addition to reinstatement, for future lost earnings and benefits;
e. Compensatory damages for emotional distress, reputational harm, and other non-economic losses;
f. Punitive damages against individual Defendants for their malicious, wanton, or oppressive conduct;
g. Such other and further relief as this Court deems just and proper.

## NOTICE OF PRESERVATION

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE ALL NECESSARY ACTIONS TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE.

## JURY TRIAL DEMANDED

Date: 8/07/2026

Derrick Jacobs, Pro Se Plaintiff

**Verzilli Consulting Group, Inc.**
**Consulting Economists**

Office Address:
411 North Broad Street
Lansdale, PA 19446

(215) 368-7797
Fax: (215) 368-9006

# EXHIBIT "A"

Loss in Back-Pay & Front-Pay

Re: Derrick Jacobs

August 27, 2023

Prepared by:

Andrew C. Verzilli, M.B.A.

The following is our analysis of the loss in back-pay and front-pay, relative to Derrick Jacobs. Mr. Jacobs was discharged from his employment with the City of Philadelphia on March 12, 2021.

## Documents Reviewed

- W-2 Forms : 2015 to 2019
- Pension Documents from City of Philadelphia
- Philadelphia Public Employees Retirements System Reference Guide and Summary Description
- Fraternal Order of Police and City of Philadelphia Arbitration Opinion and Award : 9/2021
- Various Publications/Source Documents (as cited)

## Background

Derrick Jacobs was born on November 10, 1964. He is presently 58.8 years of age, with an average statistical life expectancy of an additional 21.3 years (Life Tables, 2020 : from age 59).

At the time Mr. Jacobs' employment ended with the City of Philadelphia, he was employed as a Detective with the Philadelphia Police Department in the OISI Unit. Mr. Jacobs' tenure with the Philadelphia Police Department began in January 1996. His earnings from 2015 to 2019 were as follows:

| | |
|---|---|
| 2015 | $163,885 |
| 2016 | $162,514 |
| 2017 | $165,032 |
| 2018 | $142,008 |
| 2019 | $121,792 |

He had intended to undertake a DROP enrollment in January 2028 (32 years of service). Under DROP, Mr. Jacobs' pension would be frozen as the enrollment date and then he would retire effective January 2032 (4 year DROP period).

Mr. Jacobs has not been successful in securing similar comparable employment.

## Methodology, Data & Assumptions

The following methodology, data and assumptions have been utilized to estimate the losses in back-pay and front-pay, relative to Derrick Jacobs:

Earnings Absent Discharge

Based on 1) Mr. Jacobs' background/experience and 2) information provided, we have estimated earnings as a Detective with the Philadelphia Police Department to be $151,046 annually. This figure is based on his average earnings from 2015 to 2019.

Based on the FOP Lodge 5 Award/Opinion from September 2021, we have increased this level or earnings as follows:

| | | |
|---|---|---|
| July 2021 | $155,200 | [2.75% increase] |
| July 2022 | $160,632 | [3.50% increase] |
| July 2023 | $166,254 | [3.50% increase] |

Earnings in Mitigation

We have presented two alternatives of earnings in mitigation. The first alternative is based on 75th percentile earnings for Private Detectives/Investigators in the Philadelphia MSA of $76,169 annually (www.bls.gov).

We have assumed Mr. Jacobs will secure alternative employment within six months from the present (www.bls.gov). We have also considered employer-provided retirement contributions of 5% of earnings in mitigation (Employer Costs for Employee Compensation).

The second alternative assumes that Mr. Jacobs will not be successful in securing alternative employment.

Duration of Estimates

Back-Pay has been estimated from March 2021 through August 2023.

The loss in front-pay has been estimated based on Mr. Jacobs' intentions to enroll in DROP in January 2028 (32 years of service). Based on DROP, Mr. Jacobs' pension would be frozen and he would receive accrued pension payments into an account for four years (2028 to 2032)

At the end of the DROP period (January 2032), he would retire and receive the accumulated pension payments in a lump sum. As of the effective end of the DROP period, Mr. Jacobs would be 67.2 years of age.

Future Wage Growth

Based on data from 1) the recent FOP Lodge 5 Arbitration Award, and 2) the Bureau of Labor Statistics, future wage growth has been estimated to be 3.0% annually.

Normal Pension

We have estimated Mr. Jacobs' normal pension as of the time he would have enrolled in DROP based on the Plan B pension formula, which is as follows:

> 2.2% * Years up to 20 * FAC
> plus
> 2.0% * Years over to * FAC

Mr. Jacobs would have accrued 32 years of service, which results in a pension of $125,389 annually (frozen at DROP enrollment).

Mr. Jacobs would have also received a lump sum for the pension payments under the four-year DROP program from January 2028 to January 2032 (48 months) totaling $501,555 (before reduction to present value). At this time we have not considered accrued interest payments during the DROP period.

We have estimated the present values pension benefits through the life expectancy noted above, net of employee contributions (6.84%).

Health Insurance Benefits

As a retired Police Officer, Mr. Jacobs receives five years of health insurance from the City of Philadelphia. He had to use this benefit beginning at the time of his early retirement in March 2021. Had he remained employed with the City of Philadelphia, he would not have begun receiving this post-retirement benefit.

We have estimated the loss in post-retirement health insurance beginning January 2032 after the end of the DROP period. The value of retiree health insurance benefits have been estimated to be $22,463 annually (Employer Health Benefits). Future health insurance has also been increased by 3.0% annually.

At this time, we have not considered the value of health insurance benefits prior to assumed retirement. We will revise our opinions upon receipt of information relative to the Mr. Jacobs' normal contribution to health insurance as a Detective.

Accrued Pension

Mr. Jacobs underwent an early retirement in March 2021 with an accrued pension of $4,258 per month ($51,096 annually) before any Survivor/PLOP options. The present value of the accrued pension benefit over Mr. Jacobs' lifetime has been estimated to be $793,228. We have offset accrued pension benefits in the analysis.

Discount Rate

The present values of front-pay have been estimated based on a discount rate of 4.0%. This discount rate is based on 1) historical yields for short-term treasury securities (adjusted for recent low yields : www.treas.gov), and 2) the expected yields for short-term treasury forecasted by the Congressional Budget Office over the next 10 years. This discount rate reflects a reasonable rate of return for a riskless investment.

**Summary of Opinions**

Based on the information provided to date and the methodology discussed, we have estimated the loss in back-pay/front-pay, relative to Derrick Jacobs, to be as follows:

| | |
|---|---|
| Back-Pay | $388,855 |
| Front-Pay | $1,182,844 to $1,787,453 |
| **Total Back-Pay/ Front-Pay** | **$1,571,699 to $2,176,308** |

The estimates are presented within a reasonable degree of economic certainty. We reserve the right to revise our opinions if additional information is reviewed that may impact the data and assumptions utilized.

The following pages are detailed summary tables of values of the estimates. If you have any questions, please contact us.

Sincerely,

Andrew C. Verzilli, M.B.A.

**Derrick Jacobs**

**Table 1 : Back-Pay : March 2021 through August 2023**

| Year | Earnings Absent Termination | Less Actual | Loss in Back-Pay |
|---|---|---|---|
| 2021 | $ 122,914 | $ - | $ **122,914** |
| 2022 | $ 157,916 | $ - | $ **157,916** |
| 2023 | $ 108,025 | $ - | $ **108,025** |
| **Total Back-Pay** | **$ 388,855** | **$ -** | **$ 388,855** |

**Derrick Jacobs**

**Table 2 : Front-Pay : To January 2032 (DROP Enrollment Janaury 2028)**

| | Mitigation as Private Detective | With No Mitigation | |
|---|---|---|---|
| Earnings Absent Termination | $ 1,288,495 | $ 1,288,495 | [to 1/2032 : DROP 1/2028] |
| Loss in Retiree Health Insurance | $ 100,681 | $ 100,681 | [5 Years after Retire] |
| DROP Lump Sum | $ 360,777 | $ 360,777 | [DROP Pension : 1/2028 to 1/2032] |
| Normal Pension | $ 830,728 | $ 830,728 | [Pension at DROP Enrollment] |
| Less Accrued Pension | $ (793,228) | $ (793,228) | [Accrued Pension at 3/2021 : $4,258 per month] |
| Mitigation : Alternative | $ (604,609) | $ - | [$59,890 plus 401K/No Alternative Employment] |
| **Loss in Front-Pay** | **$ 1,182,844** | **$ 1,787,453** | |